## Howser *et al. versus* The Commonwealth.

1. Jurors are competent witnesses in either criminal or civil issues.

2. Prisoners in challenging jurors may examine them as to their knowledge of circumstances, their expressions, opinions and prejudices, and a juror is bound to disclose what he may know, in time for the accused to cross-examine him and explain or contradict his testimony.

3. Material witnesses—those on whose testimony the event is essentially dependent—should not be admitted into the jury-box, when the fact is discovered in time.

4. "Confronting witnesses" means cross-examination in the presence of the accused; it does not mean impeaching their character.

5. Although the warden of a penitentiary is required to keep a journal, in which the reception and discharge of prisoners is entered, it is competent to prove by parol when a prisoner was received and discharged.

6. Where a witness for the Commonwealth stated, in answer to the prisoners' counsel, that he had been convicted of a felony and pardoned, *Held*, that he was a competent witness without producing the pardon.

7. A witness who had been a convict and in prison with the defendants, explained the opportunities he had of obtaining the knowledge of the facts to which he testified; on his being recalled, he was allowed to testify that he showed to persons who visited him how communications between adjoining cells could be made, and also that no inducement had been held out to him to testify. *Held*, that it was proper to corroborate him by such evidence, as he testified, under circumstances tending strongly to discredit him.

8. The declarations of a witness that she saw men about the house of the deceased, and heard cries of distress, made to others immediately after, were competent evidence in connection with other concurring circumstances.

9. Where there is evidence that the murder was committed *lucri causâ*, it is proper to prove the circumstances of the estate of the deceased, and the administration account is the best evidence of what personal estate she possessed.

10. The overruling of a motion for a new trial, and the misapplication of its own rules by the court below, are not reviewable in the Supreme Court.

ERROR to the Court of Oyer and Terminer of *Cambria county*.

John B. Howser and Daniel Busser were indicted for the murder of Polly Paul: the prisoners were tried December 9th 1865, Judge Taylor presiding. December 16th they were convicted of murder in the first degree, and same day sentenced to be hanged. The deceased was an aged unmarried woman who resided generally alone: at the time of her death a young girl named Cassy Munday lived with her. They were last seen alive June 7th 1865, and next day they were found murdered—Miss Paul in the stable and Miss Munday in the orchard. Two men named Ream and Riddle were tried for the murder in September and acquitted. A reward having been offered for the murderers, Robert Hagan and David McKelvy, police officers of Allegheny county, arrested the plaintiffs in error, in July 1865.

The evidence was circumstantial. No exceptions were taken to the charge of the court, but there were numerous exceptions to the admission of evidence, which with the overruling of the

[Howser v. Commonwealth.]

prisoners' motion for a new trial have been assigned for error in the Supreme Court.

The specifications were, that the court erred :—

1. In overruling the prisoners' objection to the competency of John Buck, a juror in this cause, as a witness for the Commonwealth.

2. In allowing John Buck to testify to the delivery of a prisoner to the warden of the Western Penitentiary, (it being objected that the fact of said prisoner's reception at the penitentiary was matter of record and should be proven by record evidence), without first proving his conviction and sentence by record evidence.

3. In admitting in evidence the record of the case of the Commonwealth v. Philip Folgert, it being objected that it did not appear that this was the same man testified to by Sheriff Buck, nor did it appear that said Folgert was ever taken to the penitentiary.

4. In allowing David McKelvey to testify to the fact that the prisoners were in the penitentiary, and when they were discharged, it being objected that the facts can only be proven by the records of the institution referred to.

5. In overruling the prisoners' objections to the competency of William McCreary, it appearing from his own statement that he had been twice tried, convicted, sentenced and incarcerated in the penitentiary for burglary—a pardon for the last conviction only being produced, and no pardon being produced for the first conviction, though the witness stated that he had been pardoned.

6. In allowing Mary Stipoliski to testify in chief to the conversations between herself, her father and family, said conversations not being in the presence of the prisoners, and occurring before the discovery of the murder, it being objected that she could not legally state what she said when she came home, and what her family or any of them said or did.

7. In allowing William McCreary to testify in chief, that he showed Mr. Johnson and Mr. Noon how communications between adjoining cells in the penitentiary could be made, it being objected that the witness could not thus corroborate himself.

8. In allowing William McCreary, on his direct examination, to answer the question, "Whether there was any promise of a pardon or any other inducement held out to him to testify in this case?" It being objected that such evidence could not be given in chief, that it tends to corroborate the witness when no attempt is made to impeach him, and that it compels the witness either to discredit himself or commit perjury, if such promise was held out or such implied understanding existed at the time.

9. In overruling the prisoners' objection to the competency of George W. Kerby as a witness, he having been sworn as a juror in this cause.

10. In allowing the letters of administration on the estate of Polly Paul, deceased, and the inventory to be read in evidence to show what personal estate was left by her, it being objected that the record cannot be evidence against these prisoners for that purpose, because they could have had no chance to cross-examine the witnesses who made the inventory.

11. In overruling the prisoners' motion for a new trial on the ground of after-discovered evidence, or any fact not brought to light on trial, &c., on the same day when made, and immediately after reasons were filed without allowing time to substantiate the facts alleged by proof, or for preparation, contrary to rule No. 60 of the said court, which is as follows :—

"Reasons for a new trial which allege after-discovered evidence, or misconduct of a party or the jury, or any other matter of fact which was not brought to view on the trial, must be verified by affidavit ; and in such case the motion shall be *placed at the head of the argument list for the next term;* but when the reasons specified are not alleged or not verified as aforesaid, the motion shall be put upon the list for the term at which it is made, and then disposed of."

*A. Kopelin, John F. Louton,* and *W. H. Rose,* for plaintiffs in error.—It is admitted that jurors are sometimes admitted as witnesses, but this practice is exceptional and is in violation of the fundamental principles of law. Originally the offence was to be tried by a jury of the vicinage, as more likely than strangers to be qualified to investigate the truth : 1 Chitty 178. Now it is considered that a knowledge of the facts aids little in investigating the truth, and that justice suffers more from the prejudices arising from living in the neighbourhood than is gained by the previous knowledge: 1 Stark. 178. Archbold, vol. 1, p. 151, says that a juror may be sworn as a witness, but he should inform the court that he has evidence to give before being sworn as a juror, and with permission of the court decline acting.

By Art. VI. Amended Constitution of the United States, it is provided that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial* jury," &c., and "to be confronted with the witnesses *against* him," &c., and by art. IX., sec. 9, of the Constitution of Pennsylvania, it is further declared that, "In all criminal prosecutions the accused shall have the right, &c., and to meet the witnesses face to face," &c. See, also, 3 Greenleaf 13, 11 ; 1 Greenleaf 128, 98.

These provisions imply that jurors and witnesses should be distinct persons. If one juror can be a witness so may the whole number ; and if the whole twelve are the prisoner's accusers and

triers, where is the just distinction between the "impartial jury" by whom the prisoner is to be tried and the witnesses with whom he is " to be confronted," and whom he has a right to " meet face to face"? Who would say that one tried before such jury had an "impartial" trial, and that he was willing so to be tried? Who would be so mad as to compare the testimony, contradict the testimony, impeach the testimony of witnesses against him, when all testifying were jurors trying him? Yet if one juror may testify, so may all; and if all, then the thing's a farce. Besides, what upon principle prevents the prosecutor from being a juror? He is but a witness, and it is said they are competent jurors. Yet if you cross the line you dare not stop.

In permitting Buck and McKelvy to state the fact of Folgert being taken to the penitentiary, their having been there and the time of their discharge, there was error. The warden of the penitentiary is required to keep a journal in which such things are to be recorded; that being the best evidence, secondary could not be received: 1 Stark. Ev. p. 53; 1 Greenl. § 86. The record of Folgert's conviction was irrelevant until it was shown that he was the same man.

Both McCreary's pardons should have been produced: 1 Greenl. Ev. §§ 373–377.

What Mary Stipoliski said were declarations not in the presence of the accused nor part of the *res gestœ*, and therefore to be excluded: 1 Stark. 58–61; 1 Greenl. § 108.

Upon the same principle, acts done by McCreary in the absence of the prisoners should have been excluded. It was also illogical to allow McCreary to corroborate himself before he was impeached.

To receive the evidence of Miss Paul's inventory was to admit the testimony of the appraisers, whom the prisoners had no opportunity of cross-examining: 1 Stark. 24; 1 Greenl. § 98.

Where the mistake of the court below in construing its rules is obvious, the Supreme Court will reverse: Daily *v.* Green, 3 Harris 128; Ellmaker *v.* Franklin, 8 Barr 189; Daniel *v.* Kilber, 12 Harris 520.

*G. M. Reade, R. L. Johnston* and *J. F. Barnes,* for defendants in error.—Every person not infamous nor interested may be a witness; the Act of Assembly requires every juror knowing anything of the cause to disclose it in open court: Act of April 14th 1834, § 158, Purd. p. 589, pl. 74. The knowledge of facts unexpressed would be more dangerous than testified to. Besides, the facts testified to were not such as to bias the jurors: Reid *v.* Clemson, 12 How. 364; 2 Hale Pl. of Crown 283; 4 Bl. Comm. 355, 358, 359; Bac. Ab. tit. *Evidence* (A); 1 Archbold's Crim. Prac. 488, 7th ed.; 1 Greenl. Ev. § 364, note 1; Graham *v.* Graham, 9 Barr 254–7; Huidekoper *v.* Cotton, 3 Watts 30.

The journal of the warden of the prison is not a record. He could not be required to take it over all the state, nor would a certified copy be evidence. The best evidence of the legal imprisonment would be an examined copy of the journal: 1 Greenl. Ev. § 493. Where the record is not part of the fact to be proved, but is merely a collateral fact, any legal proof is admitted: 1 Greenl. §§ 68, 89, 90.

The name of Folgert being the same as that in the record of conviction, the question of identity was for the jury: Sewell *v.* Evans, and Roden *v.* Ryde, 4 Ad. & El. N. S. 626.

The knowledge of McCreary's first conviction and pardon were both obtained by his own statement, both are to be taken together, and no record need be produced: 1 Greenl. § 95. The testimony of the little girl was of what occurred at the time of the murder and is part of the *res gestæ:* she was the only person who saw the perpetrators. The record of the estate was the best evidence of the circumstances of the deceased. Granting new trials pertains entirely to the court that tried the case: Cathcart *v.* Commonwealth, 1 Wright 110.

The opinion of the court was delivered, March 5th 1866, by

WOODWARD, C. J.—Polly Paul, an elderly maiden lady, who was reputed to possess money, and Cassy Munday, a young girl who lived with her, were both cruelly murdered on the evening of the 7th June 1865, in Summerhill township, Cambria county. The plaintiffs in error were defendants below in an indictment which charged only the murder of Miss Paul, and after a full and careful trial were both convicted of murder in the first degree. The evidence was circumstantial. A great number of independent and connected facts were proved, and were so placed before the jury by the learned judge who presided at the trial that no exception was taken to his charge, and consequently no question arises out of his instructions to the jury for our consideration upon this writ of error. But several bills of exception to evidence were sealed, and these are assigned for error. Although the evidence as a whole chain led irresistibly to the conclusion of guilt, yet, if any material link of it was defective, and such as ought to have been rejected, the prisoners have good right to complain in this court. Let us, therefore, carefully examine the errors assigned, to see if any of them are well founded.

The first and ninth errors complain of the admission of John Buck and George W. Kerby, two of the jurors in the box, as witnesses on the part of the Commonwealth. In respect to the first of these witnesses, it might be sufficient to say that the objection was not made until after he was sworn as a witness, when it was too late to object to his competency, and in respect of both it might be said that they were called to incidental and

[Howser v. Commonwealth.]

comparatively immaterial points, that did not touch the *corpus delicti;* but, waiving these answers, let it be distinctly said that jurors are not incompetent witnesses in either criminal or civil issues. They have no interest that disqualifies, and there is no rule of public policy that excludes them. On the contrary, it has been our immemorial practice to examine jurors as witnesses when called by either party. It is sanctioned by Archbold (see vol. 1 of Evidence, p. 151); was recognised in principle by us in Plank Road v. Thomas, 8 Harris 92, where a viewer was held to be competent; and is regulated by the 158th section of the Act of Assembly of the 14th of April 1834, relating to jurors, Purd. 586, which requires every juror impannelled in any cause to disclose his knowledge of anything relative to the matter in controversy in open court, before the jury retires to make a verdict.

The learned counsel argue that the practice violates the constitutional rights of the accused, who are entitled to a speedy and public trial by an *impartial* jury, and to be confronted with the witnesses. Our law takes the utmost care to secure to the accused, in capital cases, an impartial jury—it almost allows prisoners 'to select their own triers. They may examine jurors as to their knowledge of circumstances, their expressions, opinions or prejudices, and challenge as many as they can show cause for, and may challenge twenty without showing cause, and then if any juror happens to have knowledge of any pertinent fact, he is bound to disclose it in time for the accused to cross-examine him, and to explain or contradict his testimony. If this be not a fulfilling of the constitutional injunction in behalf of *impartial* juries, it would be difficult to invent a plan that would fulfil it and at the same time be consistent with the demands of public justice.

But counsel imagine that the constitutional right to *confront* witnesses would be abridged in the instances of witnesses taken from the jury-box, because their truth and veracity could not be attacked without damage to the attacking party. As to material witnesses, those, we mean, upon whose testimony the event is essentially dependent, we think they ought not to be admitted into the jury-box, and we believe the general practice is to exclude them where the fact is discovered in time; but we do not think the constitutional provision alluded to, nor any rule of law, is violated by the examination of a juror as a witness. The *a priori* presumption is that he is a man of truth and veracity or he would not have been summoned as a juror; and confronting witnesses does not mean impeaching their character, but means cross-examination in the presence of the accused.

When the common law of England was transported to these colonies, it gave a person charged with a capital crime no com-

1 P. F. Smith—22

338 SUPREME COURT [*Pittsburgh*

[Howser *v.* Commonwealth.]

pulsory process to obtain witnesses, and entitled him to no examination by himself or his counsel of witnesses brought against him. As Queen Mary said to her chief justice, Sir Richard Morgan, "it did not admit any witness to speak, or any other matter to be heard in favour of the adversary, her majesty being party." To remedy this state of the law, our constitutions all declared, what statutes had then provided in England, that the accused should have an impartial trial by jury, should have process for witnesses, and be entitled to counsel to examine them, and to cross-examine those for the prosecution in the presence of (*confronting*) the accused.

And this is now our inflexible rule. I have known one case in which a great question was made, whether a magistrate's written examination of a prisoner, who afterwards broke jail and escaped, was evidence against a confederate under the provisions of the statute of 2 & 3 Philip and Mary, c. 10. The case did not reach this court, though the opinions of some of the then judges were taken, and it was finally decided that, notwithstanding the above-named statute had been extended to Pennsylvania, it was displaced by our constitution, and that no *ex parte* testimony could be given against a prisoner in a capital case.

Such, then, is the meaning of the constitutional provision which counsel invoke; and it is impossible to apply it to exclude a juror-witness. He, like all other witnesses, must "confront" the accused, that is, be examined in the presence of the accused, and be subject to cross-examination; but he is not disqualified to be a witness.

It became necessary for the Commonwealth to show, in the course of the trial, that the prisoners had been in the Western Penitentiary, and in intercourse with other prisoners there, and particularly one Philip Folgert, a convict sent from Cambria county, and from whom the prisoners heard of Miss Paul—the theory of the prosecution being that the prisoners had plotted the robbery and murder of Miss Paul whilst in prison, and that they proceeded to execute the plot as soon after their enlargement as circumstances permitted. Sheriff Buck, who took Folgert to the penitentiary, was called to prove that fact, and David McKelvy proved that the defendants had been in the penitentiary, and fixed the time of their discharge.

This testimony was objected to, and forms the basis of the second and fourth assignments, because the warden of the penitentiary is required by the Act of Assembly of April 23d 1829, Purd. 651, to keep a journal in which the reception and discharge of prisoners is regularly entered, and that record, it is argued, was the best evidence of the facts to which these witnesses swore.

The Act of Assembly does not make the warden's journal a record, nor declare that it shall be evidence of the facts therein entered. The main purpose of keeping it is to inform the inspect-

ors of the prison of the name, age, condition and circumstances of each prisoner, that their duties may be intelligently performed. If the question had been whether Folgert and these defendants had been legally incarcerated, it might have been necessary to show every formality prescribed by law, but the main point was the conspiracy to rob and murder, and the fact of their being together in the penitentiary was only incidental or introductory to that point. Says Mr. Greenleaf, vol. 1, pl. 68, where the record or document appointed by the law is not a part of the fact to be proved, but is merely a collateral or subsequent memorial of the fact, such as the registry of marriages, births and the like, it has not an exclusive character, but any other legal proof is admitted. If the marriage or birth of the prisoners had been wanted as introductory to evidence of the crime charged, it would scarcely be argued that a witness, who was present at the birth or marriage, was incompetent to prove it, because a registry existed. In questions of identity, records and registries are not the best evidence, for after the entries in them are received it is necessary to individuate the persons mentioned, and this must be done by evidence *dehors* the document. We have an illustration in the third error assigned, which complains of the admission of the record of Folgert's conviction and sentence without identification of his person. We do not mean to say that we consider the third assignment any better than the second and fourth, but simply that it illustrates the necessity to add, even to a *judicial record*, oral evidence of identification.

The record proved Folgert's conviction and sentence, and Sheriff Buck identified him as the individual he took to the penitentiary, whilst McKelvy identified the defendants on trial as inmates of the prison. We cannot be persuaded that there was any error in submitting such evidence to the jury.

The fifth assignment relates to the witness William McCreary. When this individual was called by the Commonwealth he stated in answer to questions by the *prisoner's counsel*, that he had recently got out of the penitentiary where he had been confined on a conviction for burglary; that he had been in before on a similar charge and had been pardoned, and that the pardon was in Washington county. The counsel for the Commonwealth then exhibited an executive pardon for the last offence, and the court admitted the witness. This is assigned for the fifth error.

If the pardon exhibited did not cover the first as well as the last conviction (of which we cannot judge, for the pardon is not shown to us), the fact that he had been pardoned for the first offence was elicited by the examination of the defendant's counsel, and it is not for the defendants to object that the fact was improperly proved. Both pardons were sufficiently proved to justify the court's admission of the witness.

[Howser *v.* Commonwealth.]

And we think there was nothing in the testimony of this witness on which to ground the seventh and eighth assignments of error. He was permitted to explain the situation and relations of the cells, and the arrangements made of prisoners, to show what opportunities he possessed of acquiring knowledge of the facts he detailed.

And when he was recalled he was permitted to detail what occurred when Messrs. Noon and Johnson visited him in his cell; that he showed them how communications between adjoining cells could be made; and he was permitted also to testify that no promise of a pardon or other inducement had been held out to him to testify in this case. All this was objected to because it tended to corroborate the witness when no attempt had been made to impeach him, and the question about pardon compelled the witness to discredit himself or commit perjury, if such promise had been held out. Though not formally impeached, this witness, as a pardoned convict, testified necessarily under circumstances that tended strongly to discredit him. The jury would inevitably regard his testimony with suspicion. It was very proper, therefore, to corroborate him, and surely if he could demonstrate to his visitors that communication between cells was possible, he had a right to prove the fact in corroboration of his statement that such communications had actually taken place. And he was entitled also to the fact that no inducement had been held out to him to testify against the defendants. These were rights of the witness, and he was in circumstances to justify his claim of them, and the court's concession of them.

The conversations of prisoners among themselves about " points" to be made when they get out, is not the most satisfactory kind of evidence, especially when proved by only one of their number, pardoned for the purpose of being made a witness; but the credibility of this witness was fairly submitted to the jury, and there were many circumstances in proof by other witnesses that tended strongly to corroborate him. True, his testimony was most damaging to the defendants, if believed, but the Commonwealth was entitled to lay it before the jury, and it is not for us to doubt that the jury scanned it closely, and gave it no more weight than was due to it.

The sixth error is founded on the declarations of Mary Stipoliski, made to her parents the evening of the murder. This little girl had been sent out, at nightfall, to fetch home the cows, and when she came home she told her parents what she saw and heard, and that she thought the men she saw at Polly Paul's were not the right kind of persons.

In itself considered, this evidence was of little importance, for it did not lead even to an early discovery of the murder. Nobody seems to have attended to the girl's story, and it might be con-

sidered irrelevant and harmless evidence, if subsequent discoveries had not shown that these defendants were prowling about the neighbourhood, and were the very two men the little girl saw at Miss Paul's. The fact that she saw men there, and heard sounds of distress, was competent and relevant, and it was rendered no less so by the additional fact that she told it to her parents directly she returned home. This circumstance she had a right to refer to as refreshing her memory. And what her parents said in reply was also a circumstance to refresh her memory. The damaging part of this evidence does not consist in the narrative that burst from the lips of this little girl on her return home, much less in the responses of the parents, but it consists in the facts themselves, facts to which she swore on the trial, and which interweave themselves with facts furnished by other witnesses, in such manner as to form what the jury considered a web of guilt.

The facts, that is, what she saw and heard, are not objected to as improper evidence, but only her relation of them to her parents and their replies. Ordinarily, declarations of third parties in the absence of the accused are not evidence, but these declarations were so connected with the circumstances as to become a part of them, or if they cannot be so considered, they were immaterial and harmless, and therefore afford no ground for reversing.

The tenth assignment relates to the administration account of the estate of the deceased. It was a public record, and, we think, properly admitted. It is usual to prove the circumstances of the decedent's estate, when the murder is committed *lucri causâ*, and the administration account is the best possible evidence of what personal estate was possessed. If it failed to show a personal estate which other evidence proved to have belonged to the deceased, and the Commonwealth was thus enabled to furnish the jury with an inference of robbery, it was an inference to which the Commonwealth was entitled. A lone woman, shown to have had money, is foully murdered, and her administrator finds no money to administer. When men are on trial for the murder who spoke of making " a point" to rob her, and if necessary to murder her, and who spoke also of the " pile" they expected to obtain, we think it was competent to show by the public records that her personal representative found no money.

As to the overruling of the motion for a new trial, it is not a proper subject for an assignment of error. The discretion of the court is not reviewable here. Nor is the complaint that the court misapplied its own rule of practice a matter of which we can take notice. The rule is prescribed by the court itself to regulate its own discretion, and the refusal to grant a new trial is an exercise of discretion with which we cannot interfere, whether it conformed to the rule of court or disregarded it.

[Howser *v.* Commonwealth.]

We have thus gone carefully through the several errors assigned upon this record, and finding no one that would justify us in reversing the judgment, it must stand affirmed.