929 P.2d 676

**STATE of Arizona, Appellee,**

v.

**Floyd Bennett THORNTON, Jr., Appellant.**

**No. CR–95–0044–AP.**

Supreme Court of Arizona, En Banc.

Dec. 12, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Kent E. Cattani, Assistant Attorney General Attorneys, Phoenix, for the State of Arizona.

Robert F. Arentz, Phoenix, for Floyd Bennett Thornton, Jr.

## OPINION

MARTONE, Justice.

At a consolidated trial, a jury found Floyd Bennett Thornton, Jr. guilty of first degree murder, burglary, controlling property of another, and kidnaping in connection with the 1991 death of William Prince; guilty of first degree murder, burglary, and kidnaping in connection with the 1993 death of Dale Duke; and guilty of escape from a correctional facility. The court sentenced him to death for the 1993 murder of Mr. Duke and prison for the remaining convictions. Appeal to this court is automatic under Rules 26.15 and 31.2(b), Ariz. R.Crim. P., and direct under A.R.S. § 13–4031. We affirm his convictions and sentences.

## I. BACKGROUND

On July 8, 1991, Thornton burglarized the home of William Prince in Cochise County, and then shot him in the head when Prince came home. Henrietta Bennett, Prince's longtime companion, was waiting outside in her wheelchair. Thornton took Bennett into the house and tied her to the wheelchair. He took several items from the house and then left in Prince's car.

During the early morning hours of July 21, 1991, Thornton drove Prince's car off a road in Oregon. A neighbor heard the crash, picked Thornton up, and took him back to a party. The neighbor went back to the car the next morning, noticed a sawed-off shotgun on the passenger's seat, and called the sheriff's office. The United States District Court for the District of Oregon sentenced Thornton to life imprisonment for the crime of convicted felon in possession of a firearm.[1] Thornton was transferred to the Cochise County jail pursuant to the Interstate Agreement on Detainers, A.R.S. § 31–481 and 18 U.S.C. app. § 2, to allow his prosecution for Prince's murder.

Thornton masterminded an escape while awaiting trial in the Cochise County jail. After eluding the authorities for two days, he entered the home of Dale and Mary Duke. When the Dukes came home, Thornton grabbed a shotgun and positioned himself so he could "draw down on him." Def. Ex. F at 25. He shot Dale Duke in the chest as Mr. Duke opened the door. Thornton took Mary Duke inside and bound her ankles and hands. During the next five hours, Thornton talked with Mrs. Duke and loaded items into the Dukes' truck. The police arrested him on the road from Bisbee to Douglas, heading in the direction of the Mexican border.

The trial court found four aggravating factors: (1) the defendant was convicted of another offense for which a sentence of life imprisonment or death could have been imposed; (2) the defendant committed the offense in expectation of pecuniary gain; (3) the defendant committed the offense while on unauthorized release from jail; and (4) the victim was over the age of seventy. *See* A.R.S. § 13–703(F)(1), (F)(5), (F)(7), and (F)(9). The trial court found that Thornton's traumatic childhood and dysfunctional family

---

1. Thornton's sentence was reversed on appeal, and he is awaiting resentencing.

caused antisocial personality disorder, that this was mitigating, but not sufficiently substantial to call for leniency.

## II. ANALYSIS

### A. Trial Issues

**1. Trial court's denial of Thornton's challenge for cause of a prospective juror**

█ Thornton challenged Charlotte Nucci for cause because she had listened to his escape and capture on a scanner set on a police frequency. Nucci heard the sheriff's deputies and the dispatcher and learned that a death had occurred, that the police were looking for a small pickup truck, and that the police believed that the person apprehended was Thornton. Nucci heard the facts of the capture as presented by Deputy Hoke to the dispatcher. Deputy Hoke testified at Thornton's trial as to these facts. The information Nucci heard was part of the state's disclosure, including "the communications log, the times and the facts of the escape as presented to officers who were looking for him." Tr. of Aug. 16, 1994, at 270.

The trial court found that Nucci could be fair and impartial, *see* Rule 18.4(b), Ariz. R.Crim. P., and denied Thornton's challenge for cause. Thornton used a peremptory challenge on Nucci. Thornton's challenge for cause was based on A.R.S. § 21–211(1), which states that a "[w]itness in the action" "shall be disqualified to serve as juror[ ]." Thus even if she could have been fair and impartial, we are still confronted with the issue of whether she is a "[w]itness in the action."

We begin our analysis by turning to history. Early juries were composed of witnesses who were assumed to have independent knowledge of the case and were expected to use it in reaching a verdict. 6 John H. Wigmore, *Evidence* § 1800 (1940). In the mid–1600s a new rule emerged that required jurors with personal knowledge of a case to "state publicly in court on oath any such information, and not to give it in private to

his companions." 6 *id.* § 1800 (quoting James B. Thayer, *Preliminary Treatise on Evidence,* 137, 168 (1898)). By the 1700s, a well-settled principle of law required jurors with personal knowledge of a case to inform the court and to be sworn as witnesses. 6 *id.* § 1800.

Although persons with independent knowledge of a case were required to notify the court and be sworn as witnesses, they were still thought to have been capable of serving as impartial jurors. 6 *id.* § 1910. But "[a]s to material witnesses, those, we mean, upon whose testimony the event is essentially dependent, we think they ought not to be admitted into the jury-box." 6 *id.* § 1910 (quoting *Howser v. Commonwealth,* 51 Pa. 332, 337 (1865)).

As early as 1906, the Arizona Territorial Court, our predecessor, considered whether prospective jurors with personal knowledge of a case would be subject to the fair and impartial standard. *Leigh v. Territory,* 10 Ariz. 129, 133, 85 P. 948, 950 (1906). Chief Justice Kent stated in dicta that if a prospective juror had an opinion "founded upon actual knowledge of the facts ... or upon other definite knowledge or information, it is nevertheless for the court to determine whether or not such knowledge or information ... will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party." *Id.* The statute excluding witnesses in the action existed when *Leigh* was decided.[2] *See* Civ.Code 1901, § 2782. *Leigh*'s treatment of persons with actual knowledge of the case under the fair and impartial standard for disqualification rather than under the mandatory disqualification rule for witnesses implicitly limited the phrase "witness in the action" to those individuals called to testify at trial.

█ We believe the phrase "witness in the action" is broad enough to encompass both those persons who testify at trial and witnesses to the offense or transaction giving rise to the action. *See Wyle v. Texas,* 777 S.W.2d 709, 712 (Tex.Crim.App.1989). Nucci

---

2. The 1901 Arizona statute disqualified "[a]ny witness in the case." The phrase was changed to "witnesses in the action" in 1928. Rev.Code 1928, § 1906. There is no indication that this was intended to change its meaning.

was not called to testify at trial. Thus, the only question before us is whether she was a witness to the offense.

In our view, the statute was designed to prevent persons with personal knowledge of a crime from sitting in judgment of the accused. These persons are excluded because they are likely to determine disputed facts in ways consistent with what they saw or heard, rather than what they see and hear in court. "It would make each juror the absolute judge of the accuracy and value of his own knowledge." *Washburn v. Milwaukee & L.W.R. Co.*, 59 Wis. 364, 18 N.W. 328, 331 (1884). There is an additional risk that a juror with personal knowledge of a case will disclose facts to the other jurors in private, depriving the parties of cross-examination. These concerns have been present since the seventeenth century and remain valid today. However, we also recognize that advances in technology make it likely that many jurors will have learned something about an offense.

■ In order to protect the rights of the parties without unnecessarily excluding persons who are capable of serving as fair and impartial jurors, we believe witness to the offense should be limited to persons with personal knowledge of a material, disputed aspect of the case. "To allow jurors to make up their verdict on their individual knowledge of *disputed facts material to the case,* not testified to by them in court, or upon their private opinions, would be most dangerous and unjust." 6 John H. Wigmore, *Evidence* § 1800 (1940) (quoting *Washburn,* 18 N.W. at 331) (emphasis added).

■ Moreover, disqualification under A.R.S. § 21–211(1) only comes into play with persons who have knowledge that is unique to the case. Mere general knowledge, such as familiarity with the geographic location at which an event occurred, will normally not result in mandatory disqualification. *See State v. Dickens,* 187 Ariz. 1, 16, 926 P.2d 468, 483 (1996) (stating that jurors may use personal knowledge of the geographic area involved in a case to draw inferences from facts already in evidence). Similarly, a person who only has personal knowledge of immaterial or undisputed facts will not be automatically disqualified. The ability of these persons to serve as jurors should be determined under the fair and impartial standard of Rule 18.4(b), Ariz. R.Crim. P.

Nucci listened to Thornton's flight and capture. Thornton argues that she should have been disqualified because she heard the times and facts of his flight from the Duke home. But these facts were not the subject of dispute. Thornton also argues that Nucci heard the facts of the capture as reported by Deputy Hoke, who was called to testify. A review of the record reveals that Hoke's testimony involved undisputed facts. Had Nucci served on the jury, she would not have been required to choose between what she heard on the scanner and what the witnesses said about the same events. Because the information Nucci obtained when she listened to the scanner did not involve disputed facts, she was not a witness in the action under A.R.S. § 21–211(1). And because the trial judge properly found that she could be fair and impartial, there was no error in not excusing her for cause.

Our analysis does not set forth an all inclusive definition of those who can be categorized as witnesses under § 21–211(1). We do not need to define the outer contours of the phrase to reach the conclusion that Nucci was not a witness in the action. We hold only that Nucci was not a witness for purposes of § 21–211(1) because she was not called upon to testify and because she was not a witness to a material, disputed aspect of the case.

Trial judges must be particularly careful when a juror is challenged as a witness. If the information Nucci obtained had been material and disputed, *State v. Huerta,* 175 Ariz. 262, 855 P.2d 776 (1993), would have required a reversal even though Nucci did not serve as a juror. If confronted with a challenge for cause in which the facts do not clearly establish whether a prospective juror should be removed, the better practice will be to resolve doubt in favor of disqualification.

### 2. Compelled disclosure of Thornton's past mental health records

Thornton concedes that by raising the insanity defense he waived the physician-

patient privilege as to his mental health records. *See* A.R.S. § 13–3993(C). He acknowledges that the state could use relevant evidence about his mental health that it gained through its own investigation. Thornton also admits that the state could have required him to submit to a mental health evaluation. *See State v. Schackart,* 175 Ariz. 494, 500, 858 P.2d 639, 645 (1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 220 (1994). Despite these concessions, Thornton argues that the trial court's order requiring him to disclose all mental health experts and hospitalization records of past evaluations violated his right against self-incrimination under the Fifth Amendment to the United States Constitution and article 2, section 10 of the Arizona Constitution.[3] We do not agree.

The medical records and names to which Thornton objects were neither offered nor received in evidence. Thornton never specified which records or psychiatrists' names were objectionable nor does he indicate how this information would be incriminating. Nevertheless, we address the narrow question of whether the mere compulsion itself violated the Fifth Amendment.

■■■ The Fifth Amendment privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966). Testimonial or communicative evidence is limited to "that which reveals the subjective knowledge or thought processes of the subject." *State v. Theriault,* 144 Ariz. 166, 167, 696 P.2d 718, 719 (App. 1984).

■■■ The limited question before us is whether the act of turning over the names of psychiatrists and mental health records is testimonial or communicative and incriminating. *See Baltimore City Dep't of Social Servs. v. Bouknight,* 493 U.S. 549, 554–55,

110 S.Ct. 900, 905, 107 L.Ed.2d 992 (1990) ("When the government demands that an item be produced, 'the only thing compelled is the act of producing the [item].' ") (quoting *Fisher v. United States,* 425 U.S. 391, 410 n. 11, 96 S.Ct. 1569, 1580 n. 11, 48 L.Ed.2d 39 (1976)). We recognize that under certain circumstances requiring a defendant to produce papers may be a communication. *See Schmerber,* 384 U.S. at 763–64, 86 S.Ct. at 1832 (citing *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). But the act Thornton was required to perform did not reveal his subjective knowledge or his thought process and thus did not implicate the Fifth Amendment. Compelling Thornton to disclose the identity of past psychiatrists was a neutral act that by itself was not inculpatory. *See California v. Byers,* 402 U.S. 424, 433–34, 91 S.Ct. 1535, 1540–41, 29 L.Ed.2d 9 (1971). Although providing this information may have led to an inquiry that resulted in the discovery of inculpatory information, "those developments depend on different factors and independent evidence." *Id.* at 434, 91 S.Ct. at 1541. Similarly, requiring Thornton to turn over his past records was not testimonial or communicative, nor did the act of providing the records incriminate him in any way. The state could have obtained the records from the psychiatrists with or without excision. The records were discoverable because he put insanity at issue. There is thus no self-incrimination issue.

### 3. Admission of an autopsy photograph and a crime scene video

■■■ Thornton objected to the admission of an autopsy photograph showing the gunshot wound to Prince's head and a crime scene video made after his murder. Thornton argues that his offer to stipulate to the identification of Prince rendered the photograph and video irrelevant. Thornton also argues that any probative value was substantially outweighed by the danger of unfair prejudice.

---

3. Thornton does not argue that Arizona's constitutional protections against self-incrimination are more extensive than the Fifth Amendment. We therefore analyze his state and federal consti-

tutional claims under the same standard. *See State v. Mauro,* 159 Ariz. 186, 190–91, 766 P.2d 59, 63–64 (1988).

■ Inflammatory photographs are admissible if they are relevant and their probative value outweighs the danger of unfair prejudice. *State v. Walden,* 183 Ariz. 595, 610, 905 P.2d 974, 989 (1995), *cert. denied,* — U.S. —, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996). The autopsy photograph shows how Prince was killed and that the shot was fired from approximately five inches away. The photograph is, therefore, relevant. The trial court found that the photograph was not unduly gory, and did not abuse its discretion in finding that the probative value of the photograph was not outweighed by the danger of unfair prejudice. There was no error.

The video shows a walk through of the entire house. It illustrates the testimony of the police and Henrietta Bennett, and is relevant. Thornton argues that the video was unfairly prejudicial because it repeatedly showed Prince's body and because blood appeared to be oozing from his head. The trial court noted that on the two occasions when the victim's body was shown, blood did not appear to be oozing. We agree with the trial court's characterization of the video and find that the video was not unduly prejudicial. There was no error.

### 4. Statements made to Daniel Schlesinger

■ Thornton contends that his statements to Daniel Schlesinger, a detention officer at the Lane County jail, were admitted in violation of his Fifth and Sixth Amendment rights. The interaction between Thornton and Schlesinger began when Thornton called Schlesinger down to his cell to quiet down the other inmates. When Schlesinger told Thornton he was unable to quiet down the inmates, Thornton threatened him. Thornton later called Schlesinger to his cell and asked for aspirin. Thornton apologized for the threats and said that he was under a lot of stress. Schlesinger asked why he was stressed. Thornton said that the charges against him were the source of his stress.

Schlesinger asked him what kind of charges were pending. Thornton responded that he was facing a federal gun charge. Schlesinger then asked whether there were also charges relating to something in Arizona and Thornton responded that he was facing a murder charge. Thornton then began talking about the charges. Schlesinger stimulated the conversation by reiterating what Thornton said in the form of a question.

Thornton argues that the conversation violated the Fifth and Sixth Amendments because Schlesinger's statements were likely to elicit an incriminating response. The state contends that Thornton's rights were not violated because Thornton initiated the conversation and Schlesinger did not ask direct questions, but kept the conversation going. The trial court held that even if the conversation was custodial interrogation, it was permissible because Thornton initiated the contact.

We do not have to decide whether the conversation violated Thornton's Fifth and Sixth Amendment rights because even if it did, in light of the evidence in this case, it would have been harmless.

Thornton argues that the error in admitting the conversation was not harmless because the jury was able to picture the Prince homicide as a premeditated plan rather than the result of psychological problems. Thornton argues that the conversation with Schlesinger contradicted his claim of second degree murder without premeditation and the insanity defense. But Thornton was convicted of felony murder, not premeditated murder. Nor was the conversation related to Thornton's claim of insanity.[4]

Moreover, Thornton's statements to Schlesinger were also made, in a separate conversation, to Richard Sherman, the mental health expert assigned to the Lane County jail. Sherman's testimony was the same as Schlesinger's. Thus, even if erroneously admitted, the testimony was cumulative.

---

**4.** Thornton stated that he had borrowed $14,000 from Prince to buy drugs in Mexico. Thornton said that Prince found out about the illegal drug activity and threatened to turn him in to the police. According to Thornton, these were Prince's last words. Thornton discussed tying Henrietta Bennett to her wheelchair. Thornton also recalled running Prince's car into a ditch in Oregon.

There was also substantial physical evidence of Thornton's guilt. His fingerprints were found in the Prince home. The gun found in Thornton's possession fired the cartridge casing found at the Prince residence. The bullet recovered from Prince's body was consistent with having been fired from the gun in Thornton's possession. Thornton was driving Prince's car one day before his arrest. The keys were found in his pocket. Thornton's motorcycle was located approximately four-tenths of a mile from the Prince home. Thornton was seen at the Prince home several days before the murder, while Prince and Henrietta Bennett were out-of-town. Thus, even if Schlesinger's testimony was erroneously admitted, it was harmless.

### 5. Order in which sentences must be executed under the Interstate Agreement on Detainers

■ Thornton argues that the Interstate Agreement on Detainers, A.R.S. § 31–481 and 18 U.S.C. app. § 2, prevents Arizona from carrying out his death sentence until he serves his federal sentence. We disagree.

■ A person who violates both federal and state law may not complain of the order in which he is tried or punished. *Gunton v. Squier,* 185 F.2d 470, 471 (9th Cir.1950). Thornton contends that the Interstate Agreement on Detainers is an exception to this general principle because the focus of the Agreement is on prisoners' rights. While Congress did recognize the plight of a prisoner who has a detainer lodged against him, there is no indication that the Agreement was enacted to allow a prisoner to decide the sequence of his sentences. The express purpose of the Agreement is to provide for the "expeditious and orderly disposition" of all charges underlying the detainer and to provide for cooperative procedures. A.R.S. § 31–481, art. I (1996). The purpose of the Agreement is contrary to Thornton's contention.

Thornton argues that Article V of the Agreement requires Arizona to return him to the custody of the United States. But Article V details the rights of the sending and receiving states and does not create any rights in the prisoner.[5] Thus, Thornton does not have standing to make this demand.

■ Thornton also relies on the anti-shuttling and return provisions of Article IV of the Agreement. Article IV was designed to "avoid the shuttling of prisoners back and forth between the penal institutions of the two jurisdictions." *United States v. Mauro,* 544 F.2d 588, 593 (2d Cir.1976), *rev'd on other grounds,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). Article IV ensures that a defendant will be tried promptly and that he will not be returned to the sending jurisdiction until tried by the requesting jurisdiction. *Id.* at 592. It does not support Thornton's claim that he may dictate the order of his sentences. *See New York v. Poe,* 835 F.Supp. 585, 592 (E.D.Okla.1993) ("While a prisoner may have certain clearly specified rights under Articles III and IV of the Act ..., the Act does not provide, much less suggest, that a prisoner has the right to dictate the order in which he is to serve his multiple sentences.").

■ The order in which a prisoner serves his sentences is a matter to be decided by the relevant jurisdictions. *See Remeta v. Singletary,* 85 F.3d 513, 519 (11th Cir.1996). We reject Thornton's argument that the Interstate Agreement on Detainers gives him any right to insist that he serve his prison sentence first.

### 6. Jury instruction on flight and concealment

■ Thornton argues that the evidence shows only that he left the scene of the crime, not flight or concealment. He therefore argues that the trial court's flight instruction was improper.

5. Article V provides as follows:
In the case of a federal prisoner, the appropriate authority in the receiving state shall be entitled to temporary custody as provided by this agreement or to the prisoner's presence in federal custody at the place for trial, whichever

custodial arrangement may be approved by the custodian.... At the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state.
A.R.S. § 31–481, art. V(a), (e).

Leaving the state justifies a flight instruction as long as it invites some suspicion of guilt. *See State v. Noleen,* 142 Ariz. 101, 108, 688 P.2d 993, 1000 (1984); *State v. Hunter,* 136 Ariz. 45, 48–49, 664 P.2d 195, 198–99 (1983). Immediate pursuit or concealment, though sufficient, is not necessary. *Noleen,* 142 Ariz. at 108, 688 P.2d at 1000.

Prince was murdered on July 8, 1991. On the morning of July 9, 1991, Thornton drove to the home of a friend and told her he was leaving. He was arrested in Oregon on July 21, 1991.

Dale Duke was murdered in Bisbee, Arizona. Thornton asked Mrs. Duke for instructions to Mexico. She replied that he could get to Mexico through Douglas, Arizona. Thornton looked at some of Mr. Duke's maps. He was arrested driving the Dukes' truck on the road between Bisbee and Douglas.

Assuming without deciding that Thornton's actions after the Prince murder were insufficient to justify a flight instruction, his conduct after the Duke murder supports an inference that Thornton was fleeing to Mexico. Thornton argues that his arrest shortly after the Duke murder makes an inference of flight inappropriate. But lack of success does not make a flight instruction inappropriate. The trial court did not err in giving the flight instruction.

### 7. Refusal to give Thornton's requested instruction on his impulsive and reflexive tendencies

Thornton argues that the trial court erred in refusing his requested instruction that the jury could consider his tendency to act reflexively and impulsively in stressful situations in determining whether he acted with premeditation. We need not determine whether such an instruction should have been given because Thornton was convicted of felony murder, not premeditated murder. Error, if any, in not giving this instruction is harmless because felony murder does not require a finding of premeditation.

### B. Sentencing Issues

Thornton does not contest the trial court's findings of the following four aggravating factors: (1) the defendant has been convicted of another offense for which a sentence of life imprisonment or death could have been imposed; (2) the defendant committed the offense in expectation of pecuniary gain; (3) the defendant committed the offense while on unauthorized release from jail; and (4) the victim was over the age of seventy. *See* A.R.S. § 13–703(F)(1), (F)(5), (F)(7), and (F)(9). We find that these four aggravating factors were present.

Thornton challenges the trial court's findings regarding mitigating factors. The trial court found Thornton's traumatic childhood, dysfunctional family, and antisocial personality disorder were mitigating. Thornton argues that the court erred in not finding the following factors mitigating: mental illness, both statutory and nonstatutory, remorse, cooperation, and his character. We independently review the trial court's findings.

We agree with the trial court that Thornton's childhood was traumatic. He was raised in a dysfunctional family and was moved to a juvenile facility at a young age. The consensus among the experts was that Thornton's childhood resulted in antisocial personality disorder. We agree with the trial court that Thornton's childhood, dysfunctional family, and personality disorder are mitigating factors.

Thornton argues that his mental health is a statutory mitigating factor. Thornton has the burden of proving by a preponderance of the evidence that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." *State v. Bolton,* 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995); A.R.S. § 13–703(G)(1).

There was substantial expert testimony concerning Thornton's mental health. But most of it was in conflict. The state provided substantial evidence that Thornton was malingering and feigning throughout his mental health evaluations. Thornton's experts dismissed these results as equivocal and relied

on those portions of the evaluations that supported Thornton's claim. We are unable to conclude that the mental assessments provided by Thornton's experts are more accurate than the assessments made by the state's experts. We find that Thornton failed to prove by a preponderance of the evidence that he was unable to either appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. This mitigating factor does not exist.

█ Thornton also claims that we should find nonstatutory mental illness to be a mitigating factor. We have already recognized that Thornton's antisocial personality disorder is a mitigating factor. We do not find any additional evidence that would qualify as nonstatutory mental illness. This mitigating factor does not exist.

█ Thornton argues that his remorse is a mitigating factor. Thornton expressed remorse on two occasions: (1) his statement to Dr. Geffen that he wished the death of Duke had never happened and (2) Dr. Blackmore's evaluation in which he wrote that Thornton looked remorseful and expressed some remorse as he reflected on Duke's shooting. These are insufficient to support a finding of remorse.

█ Thornton argues that his cooperation with law enforcement is a mitigating factor. Thornton's admission of guilt after he was stopped and his offer to admit guilt in exchange for the state withdrawing the request for the death penalty furthered his own interest. Cooperation that is in the best interest of the accused is not a mitigating circumstance. *State v. Ross*, 180 Ariz. 598, 607, 886 P.2d 1354, 1363 (1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995).

█ Thornton claims that his good character is a mitigating factor. We agree with the trial court that Thornton's 23 felony convictions since 1978 are not reflective of a person of good character. His life shows a consistent disregard for the rights of others. Thornton's character is not a mitigating factor.

Upon independent review, we agree with the trial court that the mitigation here is not sufficiently substantial to call for leniency.

## C. Other Sentencing Issues

Thornton raises 15 arguments earlier rejected by this court, solely to avoid future claims of waiver. We refuse to reconsider, and reject them. We note them for the record: pecuniary gain is an improper aggravating circumstance as to Thornton because Thornton's motivation in killing Mr. Duke was not pecuniary gain; prior first degree murder conviction was an improper aggravating factor since the conviction did not occur until judgment was entered at the same time as the Duke judgment; death penalty unconstitutional because of prosecutorial discretion; death penalty unconstitutional because there are no written policies and the death penalty is applied in an arbitrary manner; trial court may have had ex parte communications with probation officers and refused to disclose to Thornton that such communication occurred; death penalty unconstitutional because state is not required to prove beyond a reasonable doubt that death penalty is appropriate or that aggravating factors outweigh mitigating factors; unconstitutional burden placed upon Thornton to prove mitigating circumstances; judge rather than jury determines sentencing; statute fails to adequately channel sentencer's discretion; Thornton had no right to voir dire the sentencing trial judge; death is cruel and unusual punishment; Arizona's death penalty discriminates against young, poor, male defendants; death penalty applied to Thornton would be disproportionate to all other first degree murder cases; death penalty does not achieve legislative purpose; discretion to balance aggravating and mitigating factors results in freakish and arbitrary imposition of the death penalty; death penalty in Arizona has previously been applied in a discriminatory manner.

## III. CONCLUSION

We affirm all convictions and sentences.

FELDMAN, C.J., ZLAKET, Vice C.J., and MOELLER and JONES, JJ., concur.